UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>        vs.<br><br>TERANCE MORICE HIGHBULL,<br><br>                    Defendant. | 4:16-CR-40029-KES<br><br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

Defendant Terance Morice Highbull is before the court on an indictment charging sexual exploitation of a child, in violation of 18 U.S.C. §§ 2251(a) and (e).  See Docket No. 1.  He now moves to suppress certain evidence discovered as a result of a search of his vehicle on February 9, 2015, by Michelle Janis, and the search of his cell phone on May 21, 2015, pursuant to a state court search warrant.  See Docket No. 31 & 39.  The government opposes the motion.  See Docket No. 33 & 38.  This matter was referred to this magistrate judge to hold an evidentiary hearing and to recommend a disposition of the motion pursuant to 28 U.S.C. § 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, district judge.

**FACTS**

An evidentiary hearing was held on March 2, 2017.  Mr. Highbull was present in person along with his attorney, Assistant Federal Public Defender

Jason Tupman.  The government was represented by Assistant United States Attorney Jeffrey Clapper.  Two witnesses testified at the hearing and five exhibits were received.  From this evidence, the court makes the following findings of fact.

Officer Andrew Mattson was on duty patrolling for the Sioux Falls Police Department on the morning of February 9, 2015.  A few minutes before 9 a.m. he received a call from dispatch telling him a child called to report a family dispute was in progress at a Sioux Falls apartment house.[1]  Officer Mattson drove to the location, which was Michelle Janis' apartment.

The government introduced a video recording from the dashboard camera of Officer Mattson's vehicle of his encounter at Michelle Janis' apartment as well as a similar video made from the dashboard of the vehicle of the officer who arrived on scene as Officer Mattson's backup.  See Exhibit 1. The following is a description of Exhibit 1.

The video begins at 8:56:40 with Officer Mattson's patrol vehicle driving to the location of the call.  He arrives and parks at 8:58:07.  As he is pulling into the parking lot, a red sedan (a Ford Taurus), with its lights on, backed into a parking slot, is visible to the front and right of Officer Mattson's patrol car. See Exhibits 2 & 3 (still photos taken from Exhibit 1).   He tells dispatch, "I'm getting waved down."  He exits his patrol vehicle and asks "What's going on?" Ms. Janis, who is off-screen says Mr. Highbull took off running behind the

---

[1] The child, later determined to be Michelle Janis' son, reported that a male was harassing his mother.

building somewhere.[2]  Officer Mattson asks "Running? What's he running for?"
Ms. Janis says "He knows I turned him in."

"For what? What's going on?" Officer Mattson asks.  "Hello?  What's going
on?" he repeats.

Ms. Janis states, "I wanted to sign a complaint on him.  He went and had
pictures of my daughter naked and she's only 13.  And I told him, he was just
here and he looked out the door and he seen you guys and he took off
running."

"Ok" Officer Mattson says.  Officer Mattson testified at the hearing this
information surprised him as he thought he was responding only to a family
dispute.

Then Ms. Janis says, "Oh my God, where's my daughter?"

"What's his name?" Officer Mattson asks twice, with no response from
Ms. Janis.  Officer Mattson testified at the hearing that, during this portion of
the video/audio recording, Ms. Janis had gone back inside her apartment,
leaving the front door open/ajar.  Officer Mattson did not enter the apartment,
but stayed outside, just near the threshold of the front door.  Officer Mattson
testified he could see all the way through Ms. Janis' apartment to a sliding
glass door on the backside of the apartment.  Besides Ms. Janis, there were
some children in the apartment.

---

[2] The video camera was mounted in Officer Mattson's car.  The audio is from a
body microphone on Officer Mattson's person.  Most of the activities occurring
during this police visit take place out of the view of the video camera's lens and
so are not depicted on the video, but the audio from Officer Mattson's body mic
is depicted.

Ms. Janis then says "That's his car running out there so you better watch his car."

Officer Mattson then says over his body mic, talking to dispatch and to his cover officer who is en route to the scene, that the suspect apparently ran out the back door. He then reads to dispatch the license plate number from the red Ford Taurus parked and running in the parking lot.

"What's his name?" he again asks Ms. Janis.

She responds, "Terance Highbull." Ms. Janis then says to her son, "what is he wearing?"

The son responds "he's just wearing all black." Officer Mattson relays this information to dispatch.

Ms. Janis walks out to Mr. Highbull's car and opens the car door at 9:00:19. Chimes can be heard from the open car door. Officer Mattson did not direct Ms. Janis to do this.

Officer Mattson asks, "You gonna grab the keys?"

She answers "yes," but Ms. Janis did not, however, retrieve the keys. Instead, she merely shuts the car off, leaving the keys inside.

"Does he live here with you?" Officer Mattson asks.

"No, he don't." Ms. Janis replies, "he come here to pick up his daughter."

"Where's she at?" Officer Mattson asks.

Ms. Janis indicates the infant nearby is Mr. Highbull's daughter.

"Well, they said a child called," Officer Mattson says.

Ms. Janis answers "I had my son call."

4

"You guys were arguing?" Officer Mattson asks.  Dispatch then responds to Officer Mattson that the license plate number he called in came back registered to Terrance Highbull at Ms. Janis' address.

Ms. Janis went back into her apartment at this point, saying to Officer Mattson that she is going to lock the back door to her apartment.  "He might come back and break my windows," she explains.

"Ok, so, tell me again what's going on?" Officer Mattson asks.

"He was harassing me," Ms. Janis begins, then breaks off to say to her older children "come on, you guys watch the baby, I'm gonna step outside with the police officer."  Ms. Janis then joins Officer Mattson just outside the door to her apartment on the sidewalk and audibly shuts the door to her apartment. She begins again:  "he went and he had come and he was harassing me and was telling my son, 'cause I just got my son back, too, from the reservation, and he went and started harassing me and stuff because I won't let him see his daughter, this and that.  Then he went and told my son that he has went and had sexual contact with my daughter.  And I started going through his phone and I saw pictures of my daughter naked on his phone."

"How old is she?" Officer Mattson asks.

"She just turned 13," Ms. Janis replies.

"Do you have the phone?" Officer Mattson asks.

Ms. Janis says the following as she begins walking over to Mr. Highbull's car, "Um, I don't know if it's this . . . I think it's . . . I don't know. . . I think he does have one.  He probably got rid of it or whatever . . . the one I went through

5

had pictures of my daughter."  At the end of this rambling statement, the chimes on the car door begin again as Ms. Janis opens the car door and her voice becomes muffled, presumably because she is now in the interior of Mr. Highbull's car and no longer close to Officer Mattson's body mic.  The time is 9:02:24.  Officer Mattson testified he did not direct Ms. Janis to enter Mr. Highbull's car nor did he tell her to look inside it for a phone.  Officer Mattson never opened the car door and he never entered the car.

At almost precisely the moment Ms. Janis opens the car door, a backup officer arrives and can be heard asking Officer Mattson a question.  Mattson asks at 9:02:25, "What's that?"  He then answers the other officer's question, "Yeah, this is his car here."  He explains to the other officer what Ms. Janis has been telling him.  At 9:02:50 the other officer can be seen walking past Officer Mattson's car on the passenger side toward where he presumably joined Ms. Janis and Officer Mattson next to Mr. Highbull's car.[3]

At 9:02:54 Ms. Janis, with Mr. Highbull's white Samsung Galaxy cell phone in hand, begins speaking again to Officer Mattson, saying, "You see, I don't know how to get into 'em, but I just so happened to look in the gallery and it showed up."

"Was it this phone?" Officer Mattson asks.

"I'm pretty sure it is," Ms. Janis replied.  The car door chimes quit at 9:02:57, indicating the door to Mr. Highbull's car was shut.  "I mean I've never

---

[3] Initially Officer Mattson testified this was himself in the video.  However, after viewing the video from the other officer's vehicle, it was clarified that it was the other officer, not Officer Mattson, that can be seen walking by.

saw it, or seen anything of it, but I know that I saw pictures of my naked, of my daughter naked, and she's only 13 years old."

"And it's not his daughter?" Officer Mattson asks.

"No this was my daughter.   I know what my daughter looks like," Ms. Janis replied.  Some inconsequential comments pass, then Ms. Janis reiterates, "and he took off running out the back door.  I don't know if he went that way or this way.  He's somewhere."

"What was the date on these photos?" Officer Mattson asks.

"I don't know.  See, I couldn't, I was so shook up about it I didn't even look at dates or any. . ."

Officer Mattson testified that when Ms. Janis handed him the phone, he began looking through the photo gallery on the phone.  He interrupted Ms. Janis and showed her some photos from the gallery:  "Were these some of the photos you saw?"

Ms. Janis answers emphatically, "No.  These were in the phone—I mean, I don't know how they popped up, but it just popped up.  But deep in that phone where, in like passwords and s—t I can't get into. 'Cause when I seen 'em he took his phone."  Ms. Janis then apparently addresses an onlooker telling them to leave.

"What do you mean 'deeper in the phone' " Officer Mattson asks.

"There . . . he's got a lot of pictures on Google and he's got passwords for all of 'em," Ms. Janis replies.

"How many pictures would you say there were?" Officer Mattson asks.

7

" 'Bout six," she replied.

"Fully nude?" Officer Mattson asks.

"Yep," Ms. Janis says.

"What was she doing?" asks Officer Mattson.

"Sitting on my bed with a dildo," says Ms. Janis.

"Where at?" he asks.

"In my room," she replies.

"In this [apartment]?" he asks.

"And I don't know when it happened, because I didn't believe it was going on, and he was charged with it, but it got dismissed," Ms. Janis says.

"He was charged with . . . ?" asks Officer Mattson.

"With rape of my daughter," Ms. Janis says.

* * *

"You're pretty sure it's this phone?"

"I'm pretty sure it's that phone," she replies.

"Had he gotten into the car after?"

"He just pulled in.  He came to get his daughter. . ."

"When did you see the pictures?"

"I seen 'em couple days ago and I've been waiting for him to come and I was just going to call the cops. . . ."

Officer Mattson comments he cannot find the pictures on the phone.  He then asks, "Where's he live at?"  Ms. Janis says she does not know where Mr. Highbull lives.  Officer Mattson continued to obtain information from

8

Ms. Janis such as addresses, phone numbers, and dates of birth.  Ms. Janis
explained that her daughter left and went to live with her father on the
Yankton Sioux Reservation.  Officer Mattson told Ms. Janis that he could not
arrest Mr. Highbull based solely on Ms. Janis' word. He explained that he
would take the phone and turn it over to people trained in examining phones.

Exhibit 1 ends at 9:18:02 with Officer Mattson leaving the parking lot of
Ms. Janis' apartment house, approximately 20 minutes after he first arrived.
He testified he entered Mr. Highbull's cell phone into evidence at police
headquarters.  Later, Officer Mattson prepared a written report summarizing
his investigation at the scene of Michelle Janis' apartment.  See Exhibit 4.

In February, 2015, Jessica Speckmeier was a detective with the Sioux
Falls Police Department in the Crimes Against Persons Unit in the the Internet
Crimes Against Children section.[4]  Det. Speckmeier has been specially trained
in forensic digital evidence examination.  On February 11, 2015, Det.
Speckmeier was assigned to investigate the case documented by Officer
Mattson.  Available to Det. Speckmeier to begin her investigation were Officer
Mattson's written report (Exhibit 4); a "global jacket" with Terance Highbull's
name, address, and phone number; information about Michelle Janis; and
Exhibit 1.  Det. Speckmeier contacted Ms. Janis by telephone on February 11.
The entire conversation lasted only a couple of minutes.

Det. Speckmeier tried to obtain further details about what Ms. Janis had
seen on Mr. Highbull's cell phone, when she had seen it, particulars about the

---

[4] Jessica Speckmeier's current rank is Sergeant.

images themselves, and where on the phone Ms. Janis had discovered the pictures. Ms. Janis told Det. Speckmeier she had seen the images two to three days before the 911 call had been made on February 9. Ms. Janis identified the subject in the photos as her 13-year-old daughter. Ms. Janis said the photos were not in the photo gallery like a normal photo would be. Instead, she told Det. Speckmeier that they were in some sort of hidden application. This seemed plausible to Det. Speckmeier and technologically feasible on the type of cell phone owned by Mr. Highbull.

Ms. Janis told Det. Speckmeier she believed the photos had been taken in Ms. Janis' bedroom because she recognized the bedspread in the background of the photos as her own bedspread. Ms. Janis told Det. Speckmeier that her daughter was naked in the photos on Ms. Janis' bed. When Det. Speckmeier probed for further details about the photos, Ms. Janis became uncooperative and ended up hanging up on Det. Speckmeier.

After this contact, Det. Speckmeier tried to reconnect with Ms. Janis numerous times. She called Ms. Janis on her cell phone and left numerous voicemail messages asking Ms. Janis to contact Det. Speckmeier. Det. Speckmeier went to Ms. Janis' apartment several times and left her business card with a note asking her to contact the detective. Det. Speckmeier was never again able to contact Ms. Janis and speak with her.

Finally, on May 21, 2015, Det. Speckmeier prepared an affidavit in order to apply for a search warrant from a state court judge so that she could search Mr. Highbull's cell phone. See Exhibit No. 5. In order to prepare the affidavit,

10

Det. Speckmeier reviewed Officer Mattson's written report (Exhibit 4) and her own notes from her conversation with Michelle Janis. She never spoke to Officer Mattson nor did she review the February 9 video from his patrol car, although the video was available to her should she have wanted to view it. Det. Speckmeier testified officers who respond to a call are expected to collect all the relevant information and put it in their written reports. She also testified that she tried to verify the information from Officer Mattson's report directly by talking to Michelle Janis herself.

Det. Speckmeier acknowledged that she left out certain information from her search warrant affidavit. She omitted the fact Officer Mattson unsuccessfully tried to find photos on the phone. In Det. Speckmeier's view, this information corroborated what Ms. Janis said about the photos being in a hidden application rather than undermining the existence of the photos. Det. Speckmeier also omitted Ms. Janis' statement to her that the photos were in a hidden application. Det. Speckmeier testified she did not want to represent in her affidavit where on the cell phone the photos were stored because she did not know where they were stored.

Det. Speckmeier agreed she omitted to tell the state court judge that Michelle Janis had refused to cooperate with police and could not be located. Det. Speckmeier testified this information neither made it more, nor less, likely that the photos were on the phone.

Det. Speckmeier also did not include in her search warrant affidavit the information from Officer Mattson's report that Ms. Janis had confronted her

11

13-year-old daughter about the photos and the daughter denied it.  She had

two reasons for this omission.  First, she testified it is not atypical for teens to

deny such facts--even to deny strongly, even when the photographic or video

evidence is right there in front of them--because they do not want to get in

trouble.  Det. Speckmeier also testified she felt Officer Mattson's report was

ambiguous—he had written the child denied "it."  Det. Speckmeier was not

exactly sure what "it" was the child was denying.  In any case, Det. Speckmeier

testified the child's denial did not make it more or less likely the photos were

on the phone.

Mr. Highbull now moves to suppress the evidence obtained from his

phone.  See Docket No. 31  He argues Ms. Janis' search of his car and seizure

of his phone violated his Fourth Amendment rights.  See Docket No. 32.  He

also argues Det. Speckmeier committed a Fourth Amendment violation by

submitting an affidavit that omitted several key, material facts.  Id.  The

government opposes the motion.  See Docket No. 33.

After the evidentiary hearing in this matter, the court asked counsel to

address (1) the application of the exclusionary rule in this case in view of a

second, subsequent search warrant issued in federal court and (2) whether

Mr. Highbull had abandoned his car.  Both parties then submitted

supplemental briefs.  See Docket Nos. 38 & 39.

## DISCUSSION

### A.    Was Michelle Janis Acting as an Arm of the Government?

Although two search warrants were issued regarding Mr. Highbull's

phone, Mr. Highbull argues these search warrants were derivative of Michelle

Janis's violation of his Fourth Amendment rights when she entered his vehicle

and took his phone.  Because Mr. Highbull's arguments begin with this action,

the court analyzes this argument first.

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses,
> papers, and effects, against unreasonable searches and seizures,
> shall not be violated, and no Warrants shall issue, but upon
> probable cause, supported by Oath or affirmation, and particularly
> describing the place to be searched and the persons or things to be
> seized.

The touchstone of the Fourth Amendment is "reasonableness," and

"reasonableness" usually requires the government to obtain a search warrant

before searching for evidence of a crime.  Riley v. California, 573 U.S. ___, 134

S. Ct. 2473, 2482 (2014).  Without a warrant, a search is "reasonable" only if it

fits into a specific exception to the warrant requirement.  Id.  Whether to

exempt a category of search from the warrant requirement is determined by

weighing "the degree to which [the search] intrudes upon an individual's

privacy and," "the degree to which it is needed for the promotion of legitimate

governmental interests."  Id. at 2484.  Where a search takes place by a private

citizen, it is the defendant's burden to show government action.  United States

v. Reed, 15 F.3d 928, 931 (9th Cir. 1994).

A search by a private citizen, even an unreasonable one, is not subject to the Fourth Amendment's restrictions on search and seizure unless that private citizen is acting as an agent or instrument of the government.  United States v. Jacobsen, 466 U.S. 109, 115 (1984); United States v. Goodale, 738 F.3d 917, 921 (8th Cir. 2013); United States v. Smith, 383 F.3d 700, 705 (8th Cir. 2004); Reed, 15 F.3d at 930-31.  In determining whether a private citizen is acting as a government agent in a search, courts look at several factors including: "whether the government had knowledge of and acquiesced in the intrusive conduct; whether the citizen intended to assist law enforcement agents or instead acted to further his own purposes"; "whether the citizen acted at the government's request"; and whether the government offered a reward.  Smith, 383 F.3d at 705 (citing United States v. Hollis, 245 F.3d 671, 674 (8th Cir. 2001); United States v. Parker, 32 F.3d 395 (8th Cir. 1994); and  United States v. Malbrough, 922 F.2d 458, 462 (8th Cir. 1990) (citing United States v. Miller, 688 F.2d 652, 656-657 (9th Cir. 1982); and United States v. Koenig, 856 F.2d 843, 847 (7th Cir. 1988)).  The fact that the government does not compel the private party to search does not establish that the search was private under the Fourth Amendment.  Skinner v. Railway Labor Executives' Ass'n., 489 U.S. 602, 614 (1989).

In the Smith case, a law enforcement officer pulled a suspicious parcel from a conveyor belt at a Federal Express ("FedEx") operation and subjected the package to a drug dog sniff, which resulted in an alert by the dog.  Smith, 383 F.3d at 703.  The package was then presented to the FedEx facility

14

manager, with the explanation that the law enforcement officer suspected that the package contained drugs.  Id.  The FedEx manager asked the officer if the officer wanted her to open the package, to which the officer replied that "if she wanted to open it that would be fine."  Id.  The court held that, although the government clearly acquiesced in the FedEx manager's conduct, the manager was not acting as a government agent because the officer did not ask the manager to open the package, the manager did not feel obligated to open the package, and the manager's decision to open the package stemmed from the dual motives of making sure FedEx was not being used to transport contraband and of assisting law enforcement.  Id. at 705.

In the Malbrough case, the court concluded that a confidential informant who trespassed onto the defendant's property and discovered marijuana was not acting as a government agent.  Malbrough, 922 F.2d at 462.  Although the government had asked the informant to make undercover narcotics purchases for the government, the government did not ask the informant to trespass on Malbrough's property and did not even know about the trespass until after the fact.  Id.  To similar effect is United States v. Parker, 32 F.3d 395, 398-399 (8th Cir. 1994), holding that actions of an employee of United Parcel Service who opened a package pursuant to UPS's company policy and without the foreknowledge of government officials was not acting as a government agent.

The government cites Goodale, and Mr. Highbull cites Reed in support of their respective positions as to Michelle Janis' search and seizure of Mr. Highbull's phone.  The Reed court held when a search by a private citizen

15

falls into a "gray area," those cases "are best resolved on a case by case basis relying on the consistent application of certain general principles." Reed at 931. To resolve such cases, the Ninth Circuit applies a two-part test: (1) whether the government knew of and acquiesced in the intrusive conduct; and (2) whether the party performing the search intended to assist law enforcement efforts or further his own ends. Id. In the Reed case, the private party who conducted the search testified at the suppression hearing that he called the police because he felt Reed, a guest in the private party's hotel, was involved in drug dealing and that the police would want to know of this; he also testified he had attended classes on how to determine when a hotel guest was dealing drugs. Id. From the private party's testimony, the court concluded he conducted the search with the intent to assist law enforcement. Id. at 931-32. In this regard, the court rejected the government's explanation that the private party entered the room to ascertain that the room was in good condition because that fact was apparent immediately upon the private party's entry into the room. Id. Despite this fact being clear immediately, the private party continued to search, going through dresser drawers and Reed's latched briefcase. Id. at 930, 932.

The government in Reed emphasized that the police did not request or directly encourage the private party to search Reed's hotel room. Id. at 932. However, the court concluded the presence of the police was not merely "incidental." Id. The police stood guard at the door, ensuring the private

party's safety should Reed have returned to the room and caught him in the act of searching.  Id. at 932.

The Goodale case involved a 13-year old boy at the home Goodale was residing in who discovered Goodale's laptop computer had a history of gay teen pornography searches on it.  Goodale, 738 F.3d at 920.  The teen showed the computer to his mom, and then the two of them took the computer to the police.  Id.  During a taped interview with the teen, the teen showed the police the evidence on Goodale's laptop.  Id.  The teen also told the officer Goodale had sexually abused him and another 13-year-old boy.  Id.  Officers later secured a search warrant based in part on the evidence shown to them on the laptop.  Id.

The court rejected Goodale's suppression argument, holding the "Fourth Amendment 'does not extend to private searches that are neither instigated by nor performed on behalf of a governmental entity.' "  Id. at 921.  Because police in this case neither instigated the search nor asked the teen to perform the search on their behalf, the court held the Fourth Amendment was not implicated.  Id.  Goodale argued the private search exception did not apply because the teen committed a trespass and a theft; the court rejected this argument, too, holding that even *unreasonable* searches by private parties did not implicate the Fourth Amendment.  Id.

Mr. Highbull concentrates on the first prong of the test by emphasizing that Officer Mattson's common sense should have told him when he asked Michelle Janis, "do you have the phone?" that Michelle was acting to obtain the

phone when she entered Mr. Highbull's car. This case is not unlike <u>Smith</u> where the police told the Fed Ex manager she could open the package if she wished. Officer Mattson asked if Ms. Janis had the phone and, when she immediately walked over to Mr. Highbull's car, Officer Mattson had a pretty good idea she was going to look for the phone therein. So Officer Mattson was present and acquiesced in the search. However, he did not ask or compel Ms. Janis to conduct the search.

Here, unlike the <u>Reed</u> case, we do not have Michelle Janis' testimony. We do not, therefore, know if she felt compelled to conduct the search of Mr. Highbull's car. Based on the record before the court, the court finds no reasonable person in her circumstances would have felt obligated to search Mr. Highbull's car. Officer Mattson's tone of voice and manner throughout the encounter was never abrasive, controlling, or threatening in any way. And his words themselves were open-ended, not suggesting an answer or action.

Because we do not have Ms. Janis' testimony, we also do not know what her motivations were for wanting to seize Mr. Highbull's phone and turn it over to police. Surely part of her motivation was the protection of her 13-year-old daughter, who was depicted in the photos. She may also have had personal reasons for wanting to get Mr. Highbull in trouble: she alluded to the possibility of a custody dispute between her and Mr. Highbull concerning the child of which they were both parents (an infant, not the 13-year-old). If Ms. Janis could cast criminal suspicion on Mr. Highbull with regard to

Ms. Janis' 13-year-old daughter, it would make a court less likely to grant Mr. Highbull custody of the infant child he had jointly with Ms. Janis.

These are all speculations, of course. But there is nothing in evidence to suggest Ms. Janis was motivated *primarily* by a desire to help police. In fact, just the opposite is suggested: when then-Detective Speckmeier contacted Ms. Janis to investigate this matter further, Ms. Janis hung up on Det. Speckmeier after speaking to her for only 1-2 minutes. Furthermore, Ms. Janis thereafter refused to cooperate with police, evading personal visits and refusing to return many phone messages left for her. Ms. Janis, unlike the private hotel owner in <u>Reed</u>, had a personal stake in whether criminal charges were levied against Mr. Highbull.

Based on all the information before the court, the court concludes Mr. Highbull has failed to carry his burden to demonstrate the necessary government action to invoke the protections of the Fourth Amendment with respect to Michelle Janis' search of his car.

**B.      Whether the State Court Search Warrant was Invalid?**

Mr. Highbull also argues that the state court search warrant was invalid because Det. Speckmeier omitted several crucial facts from her search warrant affidavit. Had these facts been included, Mr. Highbull argues, the affidavit would not have demonstrated probable cause to support the issuance of a warrant.

### 1.    Preliminary Showing for a <u>Franks</u> Hearing

A defendant may challenge an affidavit supporting a search warrant on grounds that the affiant deliberately or recklessly included false information, <u>Franks v. Delaware</u>, 438 U.S. 154, 155-56 (1978).  A defendant may also challenge the deliberate or reckless omission of material information from a search warrant affidavit.  <u>United States v. Buchanan</u>, 574 F.3d 554, 563 (8th Cir. 2009).  As a preliminary matter, a defendant is only entitled to a <u>Franks</u> hearing if he makes a substantial showing that an affiant to a search warrant application knowingly or intentionally, or with reckless disregard for the truth, made false statements or omitted material facts and that the alleged statements were necessary to a finding of probable cause.  <u>Franks</u>, 438 U.S. at 155-56.  "Whether [the defendant] will prevail at that hearing is, of course, another issue." <u>Id.</u> at 172.

The court previously found (and so notified the parties pre-hearing) that Mr. Highbull was entitled to a <u>Franks</u> hearing.  Mr. Highbull made a specific, detailed showing of these facts omitted from Det. Speckmeier's search warrant affidavit:  (1) Officer Mattson had searched Mr. Highbull's phone at the scene on February 9, 2015, and did not see any child pornography; (2) Ms. Janis initially told Officer Mattson the photos just showed up on Mr. Highbull's phone, but later said she thought the photos were in a hidden application; (3) Ms. Janis told Officer Mattson she had confronted her daughter about the photos, but the daughter denied anything happened; (4) Ms. Janis was not cooperating with police and could not be located; and (5) Ms. Janis told Officer

Mattson she was "pretty sure" the phone she handed over was Mr. Highbull's and was the same phone on which she had seen photos of her daughter. Based on this showing, the court allowed evidence at the hearing concerning these omissions. Mr. Highbull has not alleged Det. Speckmeier made any affirmatively false statements, only omissions.

### 2.    Merits of the <u>Franks</u> Issue

#### a.    The Omissions Were Not Deliberate or Reckless

To prevail on a challenge of a deliberate or reckless omission from the affidavit, the court first determines whether the affiant officer made recklessly false or misleading statements or omissions in support of the warrant. <u>United States v. Martinez-Garcia</u>, 397 F.3d 1205, 1215 (9th Cir. 2005) (quoting <u>Franks</u>, 438 U.S. at 155-56). If it finds by a preponderance that the information was deliberately or recklessly omitted, the court must then inquire whether the addition of the omitted material renders the affidavit "insufficient to establish probable cause." <u>Franks</u>, 438 U.S. at 156. Because a search warrant affidavit is presumed valid, <u>see</u> <u>Franks</u>, 438 U.S. at 171, the burden of proof rests on the defendant, and the government has no burden to rebut the defendant's allegations or to otherwise move forward with the evidence.

To prove reckless disregard for the truth, the defendant must prove that the affiant "in fact entertained serious doubts as to the truth" of the allegations. <u>United States v. Williams</u>, 737 F.2d 594, 602 (7th Cir. 1984). However, "failure to investigate fully is not evidence of an affiant's reckless disregard for the truth." <u>United States v. Miller</u>, 753 F.2d 1475, 1478 (9th Cir.

1985); <u>United States v. Mastroianni</u>, 749 F.2d 900, 909-10 (1st Cir. 1984);

<u>United States v. Young Buffalo</u>, 591 F.2d 506, 510 (9th Cir.) (1979). Probable

cause "does not require an officer to exhaust every possible lead, interview all

potential witnesses, and accumulate overwhelming corroborative evidence."

<u>United States v. Dale</u>, 991 F.2d 819, 844 (D.C. Cir. 1993). The mere fact of an

omission, standing alone, is insufficient to demonstrate intent or reckless

disregard. <u>United States v. Shorter</u>, 328 F.3d 167, 171 (4th Cir. 2003)

(affirming the district court's denial of relief after a <u>Franks</u> hearing where

defendant failed to present any evidence, beyond the mere fact of omission,

that the investigator's conduct was deliberate or reckless) (quoting <u>United

States v. Colkley</u>, 899 F.2d 297, 301 (4th Cir. 1990)).

    The court concludes Mr. Highbull has failed to demonstrate

Det. Speckmeier acted intentionally or recklessly as to the admitted omissions

from her search warrant affidavit. As Det. Speckmeier testified, she did not

view it as relevant to the probable cause determination "how" Ms. Janis viewed

the photos on Mr. Highbull's phone, only that she *did* view them. In other

words, the fact that Ms. Janis initially said the photos just popped up, and

then later said they were in a hidden application, was immaterial.

    The crucial information to Det. Speckmeier was that Ms. Janis'

description was rich in corroborating detail. She didn't describe seeing "some"

photos, but instead said she saw six of them. Ms. Janis described her

daughter lying naked on Ms. Janis' own bed, the bedspread of which was

recognizable to her in the photos. She described her daughter as completely

22

unclothed, legs spread apart, genitals exposed to the camera, and a sexual device in her hand. Det. Speckmeier's failure to tell the issuing judge that Ms. Janis' variable statements about *how* she managed to view the photos was not reckless or intentional.

The fact that Officer Mattson conducted a cursory search of the phone and found nothing is closer to being relevant, but ultimately not crucial. There was no evidence introduced that Officer Mattson, unlike Det. Speckmeier, was specially trained in forensic searches of electronic devices and he did not have the specialty search equipment at his disposal in his patrol car that Det. Speckmeier had at her disposal back at police headquarters. The Supreme Court in <u>Riley</u> had held a year previous to Officer Mattson's encounter with Michelle Janis that police must obtain a search warrant before searching a phone, so Officer Mattson's warrantless field search was a Fourth Amendment violation. <u>Riley</u>, 134 S. Ct. at 2482.[5]

Det. Speckmeier may have omitted this information from her affidavit in an attempt to shield Officer Mattson from embarrassment for his legal gaffe. However, there is no evidence it was done to mislead the issuing judge. Again, the very detailed and specific description of the photos given by Ms. Janis was more important to the probable cause determination than the fact that an officer with no real training or specialization in forensic digital searches could not find any photos out in the field.

---

[5] It is a violation without a corresponding exclusionary remedy because Officer Mattson found nothing.

Det. Speckmeier explained two reasons for not including in her affidavit the fact that the child victim denied anything inappropriate took place. First, it is not unusual for child victims of sexual contact to deny anything occurred—a fact of child sexual contact cases with which most judges are familiar. Such children often fear getting in trouble, "picking sides" between parents and being shamed. For these reasons they often do not want to disclose. Had the judge been told the child denied the allegations, probably the court would have determined this was typical and not necessarily indicative of whether the child was telling the truth. Second, Det. Speckmeier testified Officer Mattson's report was somewhat vague as to what the child was denying exactly. The report says she "denied it." The pronoun "it" is not especially clear.

Det. Speckmeier found it inconsequential that Ms. Janis was uncooperative with police. In her words, the fact that Ms. Janis was not helping police neither made it more, nor less, likely that the photos of her daughter were on Mr. Highbull's phone.

Finally, Det. Speckmeier did not record in her affidavit Ms. Janis' words at the scene on February 9 that she was "pretty sure" the phone she handed over to Officer Mattson was Mr. Highbull's. That is because those words— "pretty sure"—were not recorded in Officer Mattson's written report. Instead, the written report stated that Mr. Highbull had fled the scene out the apartment back door upon the arrival of police, leaving his car running, unlocked, and with loud music playing in the parking lot out in front of the apartments. The written report also stated that Ms. Janis retrieved the phone

in question from this car of Mr. Highbull's, so hastily abandoned. The clear implication is that the phone, contained in Mr. Highbull's car (verified by Officer Mattson as belonging to Mr. Highbull), was also "probably" Mr. Highbull's.

Det. Speckmeier did not review the video of the encounter with Ms. Janis from Officer Mattson's patrol car. This in and of itself is not intentional or reckless. She assumed all the relevant information was contained in Officer Mattson's written report, which she did review. Furthermore, she attempted to verify the pertinent facts first-hand by interviewing Ms. Janis herself. Ms. Janis truncated and frustrated that attempt. Perhaps, in retrospect, and given the fact that two months elapsed between the initial seizure of Mr. Highbull's phone and the state court search warrant, a detective hitting a "dead end" with the complainant would have creatively cast about for ways to develop further information about this case and would have hit on the idea of viewing the video. However, failure to do so was not deliberate or reckless.

The court notes that, in oral argument at the conclusion of the hearing, defense counsel argued that if Det. Speckmeier was not reckless in drafting her affidavit, certainly Officer Mattson was reckless in writing his report of the encounter with Ms. Janis on February 9. Counsel supplied the court with no legal authority that a Franks challenge could be based on the deliberate or reckless omission of any officer other than the affiant. The Franks opinion itself framed its holding as "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with

reckless disregard for the truth, was included *by the affiant in the warrant affidavit*, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." Franks, 438 U.S. at 155-56 (emphasis added).  A Franks challenge requires the court to evaluate the affiant's conduct and affidavit, not that of any other law enforcement officer involved in the investigation.  As will be seen in the next subsection, there is nothing in the video that would have undermined the determination of probable cause.

### b.    Adding the Omissions Does Not Defeat Probable Cause

If one assumed Mr. Highbull showed a reckless or intentional omission by Det. Speckmeier, the court would then proceed to the next step by adding in the omitted information and evaluating whether the affidavit still demonstrates probable cause.  "When the affidavit supporting the search warrant sets forth facts sufficient to create a fair probability that evidence of a crime will be found in the place to be searched, probable cause exists." United States v. McIntyre, 646 F.3d 1107, 1115 (8th Cir. 2011) (quoting Unites States v. McArthur, 573 F.3d 608, 613 (8th Cir. 2009) (quoting United States v. Terry, 305 F.3d 818, 822 (8th Cir. 2002))).  See also Illinois v. Gates, 462 U.S. 213, 238 (1983). "Probable cause requires only a showing of fair probability, not hard certainties." United States v. Hudspeth, 525 F.3d 667, 676 (8th Cir. 2008). Whether a search warrant is supported by probable cause is to be determined by considering the totality of the circumstances.  United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007).  The issuing judge's determination of the issue

26

of probable cause should be paid "great deference." United States v. O'Dell, 766 F.3d 870, 873 (8th Cir. 2014).

Reviewing courts examine the sufficiency of an affidavit in support of a search warrant using "common sense" and not using a "hypertechnical" approach. Grant, 490 F.3d at 632 (citing United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005) (quoting United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993))). "Where the [issuing judge] relied solely upon the supporting affidavit to issue the search warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause"—except here, of course, the court "adds in" the five omissions. O'Dell, 766 F.3d at 874. See also Hudspeth, 525 F.3d at 674; United States v. Olvey, 437 F.3d 804, 807 (8th Cir. 2006).

A defendant seeking to suppress evidence obtained under a regularly issued search warrant has the burden to show by a preponderance of the evidence that the search warrant was not supported by probable cause. United States v. Chaar, 137 F.3d 359, 363 (6th Cir. 1998); United States v. De La Fuente, 548 F.2d 528, 534 (5th Cir) (1977). Cf. Carter v. United States, 729 F.2d 935, 940 (8th Cir. 1984) (generally, burden is on the defendant who moves to suppress evidence except where the search was without benefit of a search warrant).

Here, even if all five omissions were contained in Det. Speckmeier's search warrant affidavit, there would still be probable cause. Det. Speckmeier was right: the single most important fact of all was the specificity and richness

of detail in Michelle Janis' description of the six photos of her daughter which she observed on Mr. Highbull's phone.  The seized phone was "probably" Mr. Highbull's—it was found in his car that he hastily abandoned, with the engine running and unlocked in the parking lot.  Ms. Janis recognized it as similar to the phone on which she had observed her daughter's photos.  These facts give rise to a "fair probability" the phone to be searched would contain evidence of a crime.  Hudspeth, 525 F.3d at 676.  Det. Speckmeier was not required to place before the judge "all" the facts known to her; just sufficient facts to demonstrate a "fair probability."  Dale, 991 F.2d at 844.

The addition of the five omissions does not change this analysis.  The fact the child denied the allegations is not surprising; it is a fact of most child sexual contact cases, especially where the perpetrator was a close friend or household member.  Nor is Ms. Janis' refusal to cooperate unusual--again, especially where the perpetrator was her former boyfriend and father of one of her children.[6]  Officer Mattson's fruitless initial search of the phone was inapposite because it was not shown he had any special skills, training, or equipment for such searches.  The location of the photos in the phone is inapposite; the detailed description of the photos gave credence to the fact such photos existed on the phone, which is all that mattered.  As the government pointed out in oral argument, this was not some vague assertion that there were "naked" photos on the phone.  The assertion was very specific:  "my"

---

[6] Ms. Janis told Officer Mattson in Exhibit No. 1 she had been dating Mr. Highbull for 10 years.

completely naked "13-year-old child" was on "my" bed holding "my" dildo and spreading her legs, showing her genitals to the camera. All the details necessary to conclude the phone contained contraband were there.

Ms. Janis' use of the word "pretty sure" is the linguistic equivalent of "fair probability." A "fair probability" is all the law requires. The court concludes that even if Det. Speckmeier's omissions could be viewed as reckless, the addition of those omissions to her search warrant affidavit does not defeat probable cause. Accordingly, the court recommends denying Mr. Highbull's motion to suppress based on his <u>Franks</u> argument as to the state court search warrant.

## C.    The Issuance of the Federal Search Warrant Obviates Suppression

The court takes judicial notice that eleven months after the state court search warrant was issued in May, 2015, a federal court issued a search warrant for a search of Mr. Highbull's phone for evidence of sexual exploitation of a child in April, 2016. <u>See</u> <u>In the Matter of the Search re:  Samsung Galaxy S3 cellular telephone</u>, 16-mj-29.[7] The affidavit in support of this search warrant was much more extensive than that of Det. Speckmeier's and included a number of additional details. <u>See</u> <u>id.</u> at Docket No. 2. The issuance of this second, federal, search warrant obviates Mr. Highbull's suppression motion for two reasons. First, even if a reviewing court disagrees with this court and finds a Fourth Amendment violation occurred in state court, the federal warrant purges the taint of that violation. Second, again, even if a reviewing court finds

---

[7] The search warrant was issued by this magistrate judge. The court's taking of judicial notice is based on FED. R. EVID. 201.

an earlier Fourth Amendment violation occurred, the federal officer who obtained the federal search warrant relied in good faith on that federal warrant.

### 1.    Purging the Taint

The Supreme Court explained in <u>Wong Sun v. United States</u>, 371 U.S. 471, 488 (1963), not all evidence which derives from a constitutional violation is "fruit of the poisonous tree" of the original violation.  Instead, in determining whether the fruit (i.e. the evidence which is the target of the suppression motion) is "tainted" and must therefore be excluded, courts should evaluate whether police obtained the fruit by exploiting the constitutional violation, or whether they obtained it by means distinguishable enough from the original violation to "purge" the primary taint.  <u>Id.</u>  The Supreme Court expounded upon the attenuation doctrine last term, stating "even when there is a Fourth Amendment violation, th[e] exclusionary rule does not apply when the costs of exclusion outweigh its deterrent benefits." <u>Utah v. Strieff</u>, 579 U.S. ___, 136 S. Ct. 2056, 2059 (2016).  This is because sometimes, "the link between the unconstitutional conduct and the discovery of the evidence is too attenuated to justify suppression."

Here, Mr. Highbull alleges Fourth Amendment violations occurred when Ms. Janis searched his car and seized his phone and again when Det. Speckmeier searched his phone pursuant to the state court search warrant. However, no unconstitutional conduct is alleged as to the federal agents or their federal search warrant.  Instead, Mr. Highbull relies on the "fruit of the poisonous tree" doctrine to suppress the fruits of the federal search warrant.

The court examines, then, whether the evidence gained from executing the federal search warrant should be suppressed even if an earlier Fourth Amendment violation occurred.

In <u>Strieff</u>, an officer made a <u>Terry</u>[8] stop of Strieff illegally because he did not have reasonable suspicion to support the stop.  <u>Strieff</u>, 136 S. Ct. at 2060. During the illegal stop, the officer discovered that there was a valid, active warrant outstanding for Strieff's arrest.  <u>Id.</u>  The officer arrested Strieff and, during a search incident to arrest, discovered methamphetamine and paraphernalia on Strieff's person.  <u>Id.</u>  Strieff moved to suppress the drugs and paraphernalia as fruit of the poisonous tree of the illegal <u>Terry</u> stop.  <u>Id.</u>

The Court outlined three exceptions to the fruit of the poisonous tree doctrine:

> (1) independent source doctrine where evidence from an illegal search is admissible if acquired from a separate, independent source;
>
> (2) inevitable discovery where illegally obtained evidence is admissible if it would have been discovered even without the unconstitutional source;
>
> (3) attenuation doctrine where the connection between the constitutional violation and the evidence is remote or has been interrupted by an intervening circumstance.

<u>Id.</u> at 2061.

---

[8] <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).  A <u>Terry</u> stop allows police to detain or question someone briefly to dispel or confirm whether criminal activity is underway so long as the officer has a reasonable articulable suspicion that the person is involved in criminal activity.  <u>Terry</u>, 392 U.S. at 30;  <u>United States v. Spotts</u>, 275 F.3d 714, 718 (8th Cir. 2002)

In applying the third exception in <u>Strieff</u>, the Court evaluated the <u>Brown</u>[9] factors:  (1) the temporal proximity between the constitutional violation and the discovery of evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the police conduct.  <u>Id.</u> at 2061-63.  Temporal proximity strongly favored suppression because the evidence was discovered only minutes after the constitutional violation and the Court held usually "substantial time" must elapse between the two events.  <u>Id.</u> at 2062.  The second factor strongly favored admissibility of the evidence as the arrest warrant was valid, it predated the <u>Terry</u> stop, it was entirely unconnected with the <u>Terry</u> stop, and, once the officer discovered the existence of the warrant, he was mandated to execute it.  <u>Id.</u>  Once the officer arrested Strieff, it was incumbent upon the officer to conduct a search of Strieff's person incident to arrest to ensure officer safety.  <u>Id.</u> at 2063.  The third factor also favored admissibility because the officer's conduct was, at most, negligent in violating Strieff's rights rather than purposefully and flagrantly illegal.  <u>Id.</u>  Also, there was no indication that the officer's conduct was part of a pattern of systemic or recurrent police misconduct.  <u>Id.</u>

Here, assuming either Ms. Janis' actions or Det. Speckmeier's actions violated Mr. Highbull's constitutional rights, the court concludes the evidence from the federal search warrant should not be suppressed.  The first <u>Brown</u> factor—temporal proximity—favors the government.  Nearly one year elapsed between Det. Speckmeier's search warrant and the federal warrant.  Fifteen

---

[9] <u>Brown v. Illinois</u>, 422 U.S. 590 (1975).

months elapsed between Ms. Janis' actions and the federal warrant. Therefore, the acquisition of the "fruits" Mr. Highbull seeks to suppress were not obtained in close temporal proximity to the constitutional violations he alleges.

The second Brown factor—intervening circumstances—is also in the government's favor. The federal warrant was issued by a different judge, applied for by a different law enforcement agent, and included details and facts not present in the earlier state court warrant. Furthermore, there is no indication in the federal warrant affidavit that anything untoward happened to allow the police to obtain Mr. Highbull's cell phone. Indeed, after watching the video of the events, the court has concluded nothing untoward *did* happen.

There is a strong suggestion that Mr. Highbull abandoned his cell phone when he took off running out the back door of Ms. Janis' apartment upon the arrival of the police, leaving his car in the front parking lot unlocked, running, and with lights and loud music on. See United States v. Smith, 648 F.3d 654, 660 (8th Cir. 2011) (defendant abandoned his car for Fourth Amendment purposes allowing police to search when he left the car unlocked, with keys in the ignition and motor running in a public area and ran from the police). "Abandonment" for Fourth Amendment purposes is not used to connote a complete ceding of property rights; rather, it means a suspect has relinquished his reasonable expectation of privacy in the property. Id. Because other bases support the court's ultimate conclusion herein, the court does not make a legal determination that Mr. Highbull abandoned his car on February 9, 2015.

However, even if abandonment under the Fourth Amendment did not take place, at the very least, police would have been allowed to seize the car but not search it, while waiting to obtain a search warrant. Goodale, 738 F.3d at 922 (stating "Where law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the Court has interpreted the [Fourth] Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present.") (quoting United States v. Clutter, 674 F.3d 980, 985 (8th Cir. 2012) (quoting United States v. Place, 462 U.S. 696, 701) (1983))).

In this regard, Officer Mattson would have been allowed to look through the windows of Mr. Highbull's car, even use a flashlight while doing so, and take note of items on view in the car's interior to gain facts in support of a search warrant application. United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995). Imputing to the federal officer who applied for the federal search warrant "knowledge" that the search of Mr. Highbull's car violated the Fourth Amendment in obtaining his phone is too much of a stretch. The legal question of abandonment is a close enough question that it very likely appeared to the federal agent that the state officers had obtained Mr. Highbull's phone legally.

Finally, the third factor also favors the government. Neither Det. Speckmeier's omissions nor the fact that Officer Mattson allowed Ms. Janis to

retrieve Mr. Highbull's phone from his car are flagrant or deliberate constitutional transgressions. And there is no evidence of a repeated pattern of such conduct by the police. Accordingly, this court concludes the attenuation doctrine dictates that the evidence seized from the execution of the federal search warrant should not be suppressed pursuant to the exclusionary rule. The connection between the Fourth Amendment violation, if there was one, and the evidence from the federal warrant is remote and was interrupted by intervening circumstances.

### 2. **Leon Good Faith**

Even if an affidavit in support of a search warrant fails to provide probable cause for the issuance of the search warrant, the fruits of the search will not be suppressed if the officer who executed the search warrant relied upon that warrant in objective good faith. United States v. Ross, 487 F.3d 1120, 1122-1123 (8th Cir. 2007) (describing good-faith exception pursuant to United States v. Leon, 468 U.S. 897, 921, (1984)). "When assessing the good faith of the officers, [the court] look[s] to the totality of the circumstances, including any information known to the officers, but not included in the affidavit." United States v. Rodriguez, 484 F.3d 1006, 1011 (8th Cir. 2007). The question is whether a reasonably well-trained officer would have known that the search was illegal despite the issuing judge's authorization. Hudspeth, 525 F.3d at 676.

The Leon good-faith exception does not apply in four circumstances: (1) where the affidavit in support of the search warrant is "so lacking in indicia

of probable cause as to render official belief in its existence entirely

unreasonable," (2) when "the issuing magistrate wholly abandoned his judicial

role," (3) when the warrant is "so facially deficient . . . that the executing

officers cannot reasonably presume it to be valid," and (4) when the issuing

magistrate was misled by false information in an affidavit that the affiant

knowingly or recklessly included.  Leon, 468 U.S. at 923 (citations omitted);

United States v. Pruett, 501 F.3d 976, 980 (8th Cir. 2007), vacated and

remanded on other grounds, 552 U.S. 1241 (2008)[10]; Ross, 487 F.3d at 1122.

    The Eighth Circuit found the first exception applicable in United States v.

Herron, 215 F.3d 812, 814-15 (8th Cir. 2000).  In that case, law enforcement

had drafted an affidavit focused on providing probable cause to search Buck's

residence and farm for evidence of cultivation of marijuana.  Id. at 813-14.

Then, without altering the affidavit, they submitted the same facts in support

of a request for a search warrant for Herron's residence and farm.  Id.  The only

facts alleged in the affidavit regarding Herron was that he had past convictions

for cultivating marijuana, he was Buck's relative, and Buck had been observed

at Herron's residence four months earlier, on which occasion he stated he was

there to help Herron harvest corn.  Id.  The government conceded on appeal

that the search warrant for Herron's farm lacked probable cause, but urged the

application of the Leon good faith exception.  Id. at 814.  The Eighth Circuit

refused to apply Leon, noting that the deficiencies in the Herron affidavit were

---

[10]The Supreme Court vacated the holding in Pruett as to what constitutes "use"
of a firearm during a drug trafficking crime.

not technical legal deficiencies, but rather a complete absence of facts probative of finding marijuana at Herron's place. Id. at 814-15.

Mr. Highbull does not invoke the second situation above. The third situation described above refers to alleged infirmities "with the warrant itself rather than the affidavit behind the warrant." United States v. Carpenter, 341 F.3d 666, 673 (8th Cir. 2003). This exception would apply, for example, where the search warrant "failed to particularize the place to be searched or the things to be seized." Id. Under these circumstances, the officers executing the warrant "cannot reasonably presume it to be valid." Id. (quoting Leon, 468 U.S. at 923). Mr. Highbull does not invoke this third situation either.

The fourth situation is a Franks situation. Mr. Highbull *does* assert this situation as to the *state* court search warrant. As Mr. Highbull points out in his supplemental brief, where Franks applies, Leon does not apply. See Docket No. 39 at 19 (citing United States v. Conant, 799 F.3d 1195, 1202 (8th Cir. 2015)). The court agrees with this proposition—as far as it goes. However, that proposition does not require suppression here for two reasons. First, the court has concluded no Franks violation occurred. Therefore, Franks does not automatically obviate the application of Leon here.

Second, there was no showing at all by Mr. Highbull that the *federal* agent who applied for the *federal* search warrant was aware of the five omitted facts and chose to omit them, or knew that Det. Speckmeier omitted the facts. Where a defendant attacks the fruits of a search pursuant to a search warrant, it is the defendant's burden to demonstrate that the fruits of the search should

be suppressed.  <u>Franks</u>, 438 U.S. at 155-56; <u>United States v. Carhee</u>, 27 F.3d 1493, 1496 (10th Cir. 1994).  Therefore, because Mr. Highbull introduced no evidence of a reckless or deliberate omission or false statement by the federal agent as to the federal warrant (or knowledge or recklessness on the part of the federal agent that Det. Speckmeier made such omissions or statements), there is no basis for applying <u>Franks</u> and <u>Leon</u> does apply.  The court concludes that, even if a prior Fourth Amendment violation occurred in connection with the state court proceedings, the federal agents who obtained the federal search warrant were entitled to rely on that warrant in good faith.

Mr. Highbull makes the entirely cogent observation that there were two searches here:  the search of his car and the search of his phone.  As to the phone, there were two subsequent search warrants issued that may or may not cloud the question of the exclusion of the evidence deriving from the phone. However, as to the car, Mr. Highbull correctly points out there never was a search warrant issued.  Mr. Highbull argues <u>Leon</u> cannot apply to the search of his car to "cure" the Fourth Amendment violation arising from that search. This is because <u>Leon</u> only applies to searches pursuant to search warrants and there was never a search warrant issued for the car.  If the court had found that Ms. Janis' entry into Mr. Highbull's car constituted a Fourth Amendment violation, the court would have occasion to address this argument.  However, having found to the contrary, the court finds this issue moot and does not address it.

38

## CONCLUSION

Based on the foregoing facts, law, and analysis, this magistrate judge respectfully recommends denying defendant Terrance Highbull's motion to suppress [Docket No. 31] in its entirety.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 14th day of March, 2017.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge